UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
BRADFORD CAMPEAU-LAURION,

                Plaintiff,                      09 Civ. 3790 (JSR)

  -versus-

RAYMOND KELLY, Commissioner of the New      **FIRST AMENDED**
York City Police Department; THE CITY OF           **COMPLAINT**
NEW YORK; THE NEW YORK YANKEES
PARTNERSHIP; RICARDO BOCACHICA,
an NYPD Detective; and DAVID ROBERTS,
an NYPD Detective,                                         ECF Case

                Defendants.
------------------------------------------------------------x



## PRELIMINARY STATEMENT

1. On August 26, 2008, plaintiff Bradford Campeau-Laurion attempted to take part in one of America's great pastimes – watching a baseball game at Yankee Stadium. Instead, Mr. Campeau-Laurion became the victim of political and religious discrimination when he was forcibly restrained and ejected from the stadium by two New York City Police Department officers after he tried to use the restroom during the seventh-inning stretch while the song "God Bless America" was played in the stadium. Unbeknownst to Mr. Campeau-Laurion, the New York Yankees have a policy of restricting spectator movement while this song is being played, a policy that NYPD officers enforce. After Mr. Campeau-Laurion was marched down several ramps with his arms pinned behind his back and ejected from the stadium, one of the officers concluded the encounter with the statement that if Mr. Campeau-Laurion didn't like this country, he should get out of "it."

1

2. As did every other Major League Baseball team, the Yankees began playing "God Bless America" during games following the events of September 11, 2001. Unlike most other teams, however, the Yankees also instituted a policy of seeking to prevent fans from moving during the playing of the song. It instituted this policy in an effort to promote patriotism among those attending Yankee games.

3. Through what is known as its "Paid Detail" program, the NYPD allows private businesses to hire NYPD officers, who appear at the businesses in full uniform with their weapons and who, by all appearances, are on duty. The Yankees use the Paid Detail program to hire a large number of NYPD officers for each game, and, according to public statements by a high-level Yankee official, the officers play an active role in enforcing the Yankee policy of restricting fan movement during the playing of "God Bless America."

4. The NYPD's enforcement of the Yankee policy of requiring fans to participate in "God Bless America" and the Yankee policy itself violate the First, Fourth, and Fourteenth Amendments to the United States Constitution, the federal and New York public accommodations laws, the New York State Constitution, and the common law of New York.

## PARTIES

5. Plaintiff BRADFORD CAMPEAU-LAURION is a resident of New York City. He currently lives in Astoria, Queens.

6. Defendant RAYMOND KELLY is the Commissioner of the New York City Police Department. As its chief executive officer, he is responsible for the execution of all the laws, rules, and regulations of the department. He is sued in his official capacity.

7. Defendant THE CITY OF NEW YORK is a municipal corporation within the State of New York. The NYPD is an agency of the City of New York.

8. Defendant RICARDO BOCACHICA is a detective in the NYPD who ejected Mr. Campeau-Laurion from Yankee Stadium. He is sued in his official and personal capacities.

9. Defendant DAVID ROBERTS is a detective in the NYPD who ejected Mr. Campeau-Laurion from Yankee Stadium. He is sued in his official and personal capacities.

10. Defendant NEW YORK YANKEES PARTNERSHIP is a foreign limited partnership under the jurisdiction of Ohio and located in the Bronx, New York. The New York Yankees Partnership owns the Yankees baseball team and controls operations at Yankee Stadium during baseball games.

## FACTS

11. Mr. Campeau-Laurion is a thirty-year-old man who is originally from New Hampshire. He has lived in New York for the past nine years and currently works as the Director of Web Production for an industry leading media company.

12. Mr. Campeau-Laurion is an avid and lifelong baseball fan. He began attending games when he was ten years old and has consistently followed the game since that time. He has been to nearly 100 Major League Baseball games over the course of his life, many of which he has seen at Yankee Stadium.

13. A friend of Mr. Campeau-Laurion's purchased a ticket package for the 2008 Yankee season that included tickets to eleven games. Mr. Campeau-Laurion attended several of these games with his friend. Mr. Campeau-Laurion has purchased tickets for

3

twenty-four games this season and is looking forward to attending these games in the coming months.

**The August 26th incident**

14. On the evening of August 26, 2008, Mr. Campeau-Laurion attended a Yankees game with his friend. This game was special to Mr. Campeau-Laurion because it was the last game he would attend in the old Yankee Stadium.

15. Mr. Campeau-Laurion and his friend arrived at Yankee Stadium at approximately 7:30 p.m. Mr. Campeau-Laurion went to the game directly from his office and was dressed in business casual attire. He stopped and purchased a beer at a concession stand on his way to his seat, which was located in the Tier Reserved Section 5, Row 3.

16. Mr. Campeau-Laurion and his friend enjoyed the game quietly. He chatted with his friend and with a man seated next to them. At around 8:30 Mr. Campeau-Laurion got up to buy another beer. From that point on, Mr. Campeau-Laurion remained in his seat, eating peanuts and watching the game. The mood in his section was generally calm. The section was filled primarily with families, many of whom seemed to know each other. He recognized some of them from past games. There was, however, one row of rowdy young men seated a few rows away from Mr. Campeau-Laurion.

17. During the game, Mr. Campeau-Laurion observed three police officers, in full NYPD uniform, stationed in his section. Two of these officers stood near the entrance to the tunnel leading to the concourse throughout the game. A third officer came over to

4

that area sporadically over the course of the game. These police officers mostly stood with their backs to the game and observed the crowd.

18. During the "seventh inning stretch" (the period between the first and second half of that inning) Mr. Campeau-Laurion decided to use the restroom. As he got up and made his way down the aisle, "God Bless America" began playing in the stadium.

19. Though he respects the religious activities of others, Mr. Campeau-Laurion does not participate in religious services and objects to being required to do so. Similarly, he is proud to be an American, but he objects to being required to participate in displays of patriotism.

20. As he walked toward the tunnel leading to the concourse, a uniformed New York City police officer, who upon information and belief was Defendant Ricardo Bocachica, put up his hands and mumbled something to Mr. Campeau-Laurion. Mr. Campeau-Laurion could not hear the officer's exact words, but he understood that the police officer was indicating that he could not leave during "God Bless America."

21. Mr. Campeau-Laurion, who wanted to get to the restroom during the break in the game, told the police officer that he was not concerned with "God Bless America" and attempted to move around the officer so that he could get to the restroom. However, before Mr. Campeau-Laurion had time to take more than a step or two, the police officer grabbed his right arm, twisted it roughly behind his back, and spun him around.

22. The police officer twisting Mr. Campeau-Laurion's arm then motioned to another uniformed police officer, who upon information and belief was defendant David Roberts, and stated "he's out," indicating that Mr. Campeau-Laurion was to be

5

thrown out of the game. The second officer then came over and twisted Mr. Campeau-Laurion's left arm behind his back. The two police officers kept Mr. Campeau-Laurion's arms twisted behind his back as they pushed him into the tunnel leading to the concourse area. Once in the concourse area, Mr. Campeau-Laurion became aware of people staring at him as he was being pushed by the two police officers.

23. The officers then began leading Mr. Campeau-Laurion down the many ramps leading from the Tier Reserved level to the stadium's exit. Because Mr. Campeau-Laurion had been seated in the highest section of the stadium, there were many ramps to walk down. The entire trip down took somewhere between five and ten minutes.

24. As the police officers forced Mr. Campeau-Laurion down the stadium ramps, he told the officers that they were hurting him and implored them to release his arms. He pointed out that he was not resisting them and promised he would walk down the ramps peacefully if they let him go. He stressed more than once that they were hurting him.

25. In response to Mr. Campeau-Laurion's pleas, one of the officers told him that if he did not stop complaining the officer would hurt him even more.

26. As Mr. Campeau-Laurion was pushed down the ramps, the pressure from the two police officers behind him made it difficult for him to walk down the ramps.

27. Near the exit to the stadium, one of the police officers demanded Mr. Campeau-Laurion's ticket stub. Mr. Campeau-Laurion handed over his ticket, but the officer didn't take it and it fell to the ground. He does not know whether the police officers

picked up the ticket stub. The first police officer pushed Mr. Campeau-Laurion out of the stadium and told him to get out of this country if he didn't like "it."

28. After his ejection from the stadium, Mr. Campeau-Laurion was very upset. He was disheveled, his shirt was untucked, and he was sore. Mr. Campeau-Laurion has tendonitis in one of his knees, which was aggravated because of the force the officers were using to shove him down the ramps. The day after the incident, Mr. Campeau-Laurion's arms and knees were sore from being twisted and shoved.

29. Following this incident, Mr. Campeau-Laurion was particularly distressed at having been ejected from the game. Prior to this game, Mr. Campeau-Laurion had seen the police forcefully eject spectators only when the ejected patrons were drunk, involved in fights, throwing things or similarly acting out. This experience ruined Mr. Campeau-Laurion's last memories of the old Yankee Stadium.

**The Yankees Policy Concerning "God Bless America"**

30. According to press accounts, following the events of September 11, 2001, Major League Baseball executives directed all teams to begin playing the song "God Bless America" during the break in the middle of the seventh-inning stretch. This practice continued until the end of the 2001 season.

31. At the beginning of the 2002 season, news reports indicate that several teams chose to abandon the regular playing of "God Bless America" in response to fan feedback. League officials announced that teams would only be required to play the song at Sunday games and on holidays. The Yankees, however, continued to play "God Bless America" during the seventh-inning stretch at all home games.

32. In October 2001, the Yankees also implemented a policy of restricting fan movement during the playing of "God Bless America." According to a statement made by the Yankee's Chief Operating Officer to the *New York Times* in 2007, the no-movement policy was put in place in response to complaints from spectators who were angered by the lack of respect they felt others were showing by failing to stand still during the song. The no-movement policy was approved by the principal owner of the Yankees, George Steinbrenner. A spokesperson for Mr. Steinbrenner said that the policy was intended to be an expression of patriotism and a way to honor the nation.

33. According to the 2007 *New York Times* story, the Yankee's Chief Operating Officer stated that the team had established a system of using NYPD officers, ushers, stadium security personnel, and chains to enforce its policy of preventing fans from moving during the playing of "God Bless America."

34. On the evening that he was ejected from the stadium, Mr. Campeau-Laurion was not aware of the Yankees' policy of restricting movement during the playing of "God Bless America." He later learned about the policy through newspaper articles.

35. Mr. Campeau-Laurion plans to attend future Yankee games and has purchased tickets to 24 games during the upcoming season. He does not want to be forced by the Yankees or the NYPD to have to participate in a patriotic or religious ritual in conjunction with the playing of "God Bless America" at Yankee Stadium.

**The New York City Police Department's Paid Detail Program**

36. Upon information and belief, the police officers who ejected Mr. Campeau-Laurion from the game were working at Yankee Stadium through the NYPD's Paid Detail

8

Program. This program enables private companies throughout New York City to hire uniformed police officers to work as security personnel at their venues. The Yankees have participated in the Paid Detail program since its creation in 1998. Other participants have included Madison Square Garden, Rockefeller Center, Ikea and various synagogues and merchants' associations.

37. According to an NYPD document describing the Paid Detail program, "The primary purpose of the paid detail is to provide a highly visible police presence at a specified location." Consistent with this goal, officers participating in the program are required to wear the full uniform of the day, including the officer's department-issued firearm and handcuffs. Officers also carry an NYPD radio. In addition, officers must conform to all Department grooming and appearance standards applicable to on-duty members in uniform and are subject to inspection by a Department supervisor for such.

38. Officers assigned under the Paid Detail program "are subject to at all times to NYPD rules and regulations including but not limited to courtesy and contact with the public." At locations with larger Paid Details (like Yankee Stadium), officers report to a uniformed NYPD ranking officer who is also performing a Paid Detail in a supervisory capacity.

39. Upon information and belief, the NYPD makes thousands of assignments each year under the Paid Detail program. Notwithstanding this, it has virtually no written standards directing police officers how to act when on the Paid Detail. For instance the NYPD's official policy manual for officers – known as the Patrol Guide – contains no standards about officer conduct on Paid Detail and expressly exempts the

Paid Detail program from its lengthy and detailed section governing off-duty employment.

40. The only NYPD document that the NYCLU was able to locate about the Paid Detail is posted on the Department's internal intranet. Though that document provides considerable detail about the mechanics of participation in the Paid Detail program, it contains only vague information about officer conduct while on Paid Detail. In one place it states that officers "are responsible for taking proper police action in accordance with the circumstances." Elsewhere it states, "Do not perform any duties not police related. NO pushing the money cart, no checking bags, no handing out flyers, etc."

41. Though NYPD officers working in the Paid Detail program are, by all appearances, on duty and subject to NYPD regulation and supervision, they also are subject to control by the private businesses that hire them through the program. According to an NYPD document, "The vendor will specify the exact location of the post, meal and break policy, and any conditions that may require police action." The document also states that officers will be "working directly for the vendor."

42. Officers assigned to the Paid Detail are acting under color of law and are acting as agents of the private businesses that hire them.

**The Yankees, Their Stadiums and New York City**

43. The New York Yankees and Yankee Stadium have been an important part of the cultural and economic life of New York City since the beginning of the 20th century.

The original Yankee Stadium was the location of many memorable athletic events and has hosted national and international speakers.

44. There are currently two arenas known as Yankee Stadium. The original Yankee Stadium ("old stadium"), from which Mr. Campeau-Laurion was ejected in 2008, was built in 1923 and used as the Yankee's home field until this year. The new Yankee Stadium ("new stadium") is scheduled to open for the 2009 baseball season.

45. Both Yankee Stadiums are places of public accommodation. They affect commerce through the presentation of sporting events open to members of the public and through the sale of goods and services. In 2008, for instance, attendance at Yankee Stadium for baseball games averaged 53,069 people, and there were over four million attendees to games over the course of the season. The team earned an estimated $327 million in revenue in 2007.

46. For at least four decades New York City government and the Yankees have been closely intertwined. In the early 1970s, New York City purchased the old stadium and New York City government agencies became involved in its management. In 1972, the City leased the old stadium to the Yankees on extremely favorable terms. This was made possible by state legislation which authorized the City to rent the stadium to the Yankees rather than to any other bidder. The lease was monitored by the New York City Department of Parks and Recreation and audited by the New York City Comptroller on a regular basis. When private entities wished to use the old Stadium for non-baseball purposes, they contacted the City, not the Yankees.

47. The City and the Yankees have mutually benefitted from their joint use of the stadium. Under the terms of the lease of the old stadium, the City received either rent

or a percentage of revenues from admissions and concessions at games. In addition, the City collected a portion of the revenue the team earned from cable television and parking fees.

48. Over the course of the forty years that New York City owned the old Yankee Stadium, it spent hundreds of millions of dollars maintaining and upgrading the facility and gave the Yankees rental credits in exchange for maintaining the stadium. In the 2000s, New York City municipal authorities, including two mayoral administrations, worked with Yankee management to develop a strategy to construct a new stadium for the team. This process perpetuated the long-standing fiscal and political connections between the Yankees and New York City.

49. With the construction of the new Yankee Stadium, the Yankees and New York have maintained their close ties. According to published accounts, New York City and New York State will contribute hundreds of millions of dollars to the creation of the new Yankee Stadium. Construction of the new stadium was financed primarily through tax-exempt bonds issued by the New York City Industrial Development Authority (IDA). Since 2006, the IDA has issued or approved over $1 billion worth of tax exempt bonds for the new Yankee Stadium. A nonpartisan New York City agency, the Independent Budget Office, has estimated that, by using tax-exempt funding to build the new stadium, the Yankees will save approximately $147 million over the next thirty years.

50. New York City has incurred other costs in connection with the building of the new stadium. The new stadium was built on New York City parkland which the New York State legislature made available for the construction of the new Stadium. According

to published reports, the City will bear the cost of replacing the parkland. New York City will also expend many millions of dollars to build infrastructure such as roads and sewer connections for the new Yankee Stadium and to demolish the old stadium.

51. Reports indicate that the stadium project has created additional ties between the Yankees and the public sector. Metro-North, a state agency, is expected to build a new train station near the site of the new Stadium. The cost of the new station is estimated to be almost $100 million.

## VENUE AND JURISDICTION

52. This Court has subject-matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3-4).

53. This Court has supplemental jurisdiction over all state law claims pursuant to 28 U.S.C. § 1367(a).

54. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) in that Plaintiff's claims arise in the Southern District of New York.

## FIRST CAUSE OF ACTION

55. The Defendants' actions violated Plaintiff's rights under the First and Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

## SECOND CAUSE OF ACTION

56. The Defendants' actions violated Plaintiff's rights under the Fourth and Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

## THIRD CAUSE OF ACTION

57. The Defendants' actions violated Plaintiff's rights under federal public accommodations law as stated in 42 U.S.C. §§ 2000a, 2000a-1, 2000a-2, and 2000a-3.

## FOURTH CAUSE OF ACTION

58. The Defendants' actions violated the Plaintiff's rights under Article I of the New York State Constitution. Specifically, Defendants have violated Plaintiff's right to freedom of speech as stated in § 8; his right to receive equal protection under state laws as stated in § 11; and his right to be free from unreasonable searches, seizures and interception as stated in § 12.

## FIFITH CAUSE OF ACTION

59. The Defendants' actions violated Plaintiff's rights under New York Civil Rights Law §§ 40, 40-c, and 44-a and under New York Executive Law § 296.

## SIXTH CAUSE OF ACTION

60. The Defendants' actions violated Plaintiff's rights under the common law of New York State governing false arrest, false imprisonment, assault, battery, and conversion.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court:

(1) Assume jurisdiction over this matter;

(2) Issue a declaratory judgment that the NYPD's and Yankees' actions violated the First, Fourth and Fourteenth Amendments to the United States Constitution and the public accommodations statutes of the United States, as well as the Constitution, public accommodations statutes, and common law of New York State;

(3) To the extent necessary, enjoin the NYPD and the New York Yankees from enforcing any Yankee policy that compels spectators to participate in religious or political activities while attending games at Yankee Stadium;

(4) Award compensatory damages;

(5) Award attorneys fees and costs; and

(6) Grant any other relief this Court deems appropriate.

Respectfully Submitted,

NEW YORK CIVIL LIBERTIES UNION FOUNDATION

_____
CHRISTOPHER DUNN (CD-3991)
ARTHUR EISENBERG (AD-2012)
New York Civil Liberties Union Foundation
125 Broad Street, 19th Floor
New York, NY 10004
(212) 607-3300
Counsel for the Plaintiff

Dated: May 22, 2009
　　　　New York, N.Y.

On the Complaint:

ERICA CANDE
Law Student
New York University School of Law
Civil Rights Clinic

JESSICA OLIFF
Law Student
New York University School of Law
Civil Rights Clinic